Our fifth case for this morning is Rebecca Riker v. Bruce Lemmon. Mr. Rose. Thank you, Your Honor, and may it please the Court. By refusing for the better part of a decade to permit Ms. Riker to enter its facilities in order to participate in a brief wedding ceremony with her fiancé, the DOTC has entirely prohibited her from exercising her fundamental right of marriage. So could I just clarify, Mr. Rose, that she has, over the course of this litigation, narrowed the scope of her request so that it is now only for a brief visit under whatever security precautions the Department of Corrections thinks appropriate for the occasion? Yes, Your Honor, that's correct. We obviously made a litigation decision to pursue one claim but not the other on appeal. That is all she is seeking at this point. And the prohibition of her right to marry is not reasonably related to the DOC's admittedly compelling security interests. Oh, I apologize, Your Honor. Whatever interests the DOC has in prohibiting general visitation simply does not apply in this case. To the contrary, as we say, she is seeking at this point only a single visit of short duration that does not even require that she be immediately adjacent to her fiancé. We're getting into a problem we had in the earlier case, street terms versus official terms, aren't we? Is this really a visit as a visit is contemplated in the prison regulations? It is certainly a visit as a visit. Do you want to say that? It certainly is a single visit so far as the DOC's regulations are concerned. When Mr. Vest submitted a formal request to marry Ms. Riker, it was denied on the grounds that she had to be on his visitation list. But I'm asking you, was that correct? Is it correct that under the DOC's... Given that, I know they denied it on that ground, but was that correct to deny it? What I'm getting at is, is an encounter for purposes of celebrating a marriage a visit within the terms of the regulations? I think it is to the extent that she has to be there in order for the marriage to be solemnized. I don't know that I'm in a position to say what the DOC means or does not mean by using the term visit in its formal policy documents. Is marriage and the celebration of marriage included within the general regulations of the department with respect to the celebration of marriages? I'm sorry, the general regulations of the department with respect to visit? The visit regulations that the department have does not explicitly mention marriage, no. It does not explicitly mention marriage, no. It's another function. In other words, it happens sometimes at prisons. I think that's true, Your Honor, although clearly the DOC has relied on its visitation policy in order to deny the more narrow right. You're going to genuflect before that, huh? As I say, I don't know that I'm in a position to dispute the DOC's interpretation of its own regulations. For whatever reason, they have decided that this is a visit within the terms of its regulations, and therefore, on that ground, Ms. Riker cannot enter the facility in order to marry her fiancé. There's no doubt that you're arguing that this is the mechanism they're using to say that she can't come to the prison for purposes of solemnizing the marriage. I mean, they could use any reason they want. They've consulted an astrological chart. Of course. But the essence of your claim, I thought, is that IDOC does allow inmate marriages, which after Turner v. Safley, isn't surprising that the Supreme Court has said, and that they're using this mechanism, I'll just call it, to try to use a neutral word. But you're not making an argument about how many times she can come to the prison for a chat. You're talking about the right to marry. Absolutely, Your Honor. We are seeking a visit only to the extent that it is necessary. A visit meaning physically walking into the prison. Yes, Your Honor. Yeah. And certainly, once that is accomplished, we acknowledge that the DOC has broad discretion to decide which sort of security precautions that it feels needs to be in play at that point. We've recommended that she does not even have to be adjacent to her fiancé. Certainly, close supervision can make sure that no confidential information is exchanged. And you concede, I take it, that should the marriage take place, it would be within the authority of the Indiana Department of Corrections to decide on whatever basis it wants, whether she ever comes back for an actual chat kind of visit. Yes, Your Honor. Your Honor, we concede if she is allowed to marry, I don't think anything in this court's decision or in the fact that the marriage took place would change the fact that she has still been banned from visitation. The DOC has allowed her to remain in contact with Mr. Vest through other means, and obviously it would be an atypical marriage. But no, again, we are seeking that she only once be allowed into the facility. And that is something that will impose only a very de minimis burden on the DOC's practical interests and no burden on its security interests. And I think it's precisely that type of burden that was anticipated by the court in Turner, and indeed that appears to be anticipated by some aspects of the DOC's policy on offender marriage as well. Are you arguing that the prohibition that she cannot visit during the entire period of incarceration is punitive in nature? I think it's clearly not punitive, Your Honor. This is not a case like I believe it was Martin where there was a single offense and that was what gave rise to the visitation policy. I think it's very clear at this point that she is not being allowed to visit, not because she and Mr. Vest engaged in punishable behavior. She's being prohibited from visiting simply because she is a former employee of the facility, and I don't think that's punitive at all. Thank you, Your Honor. If you'd like to save a bit of time, that's fine. Thank you. Ms. Garn. Thank you, Your Honor. May it please the court. To just explain why the case is framed the way it is, Ms. Riker is challenging the visitation policy. She had submitted requests to the department for visitation of Mr. Vest, and in some of the requests she noted that the couple would like to get married. I thought she, by the time we get to the requests that are at issue here that are recent enough to fall within the limitations period, she's asking for one, quote, visit, like one time that she can go into the prison and be in the same room as Mr. Vest so that she can marry him. Period. End of request. She's not asking for a series of contact visits or conversations. She might not even talk to him directly. She might just respond to questions from the prison chaplain. Although it's not entirely clear what she was requesting below, the claims are vague in nature, as explained in the district court's decision. I thought it was pretty clear. That's why I asked the first question I did. I thought by now it's very clear that she's narrowed her request to, let's just say, whatever it takes to allow the marriage to be celebrated within the prison. And that's what she's saying right now. And does the state oppose that? What reason would the state have for opposing that, particularly given Turner? Right. She seems to concede. I mean, I don't think there's any dispute between the two of you that Turner is the correct case for us to look at for this. Right. Well, the single visit, that is an issue that has been presented for the first time at the appellate level. It was never addressed below. The department isn't disputing that, as applied, the policy is preventing Ms. Riker's ability to marry Mr. Vest at Wabash Valley at this time. Would you say that over again? Right now the department is not disputing that, as applied, the visitation policy is preventing Ms. Riker from marrying Mr. Vest at this time, insofar as she's not being permitted to enter the facility. You're competing with an overhead fan, you know, and it's a little hard for the bench to hear you once in a while. Okay. The department is not intending, the policy is not intended to prevent marriage. It's intended to deter relationships with offenders and staff members, and where that fails is here. Ms. Riker, of course, had sexual intercourse with an inmate while she was on the job, which violates common sense rules and prison rules and, by the way, is a felony. Then the policy is intended to combat these exploitative relationships, which can lead to security issues. But the problem is, at least by the time you filed your brief, you knew from her brief that she was asking only to be able to get married, and it was the prison that actually diverted this whole discussion off into visits. You know, she was told you can't marry him unless you can visit, and you can't visit. So she said, fine, let me visit. And the district court opinion refers to Ms. Riker's visitation requests and implied marriage request. And the district court makes the somewhat astonishing statement, which I think is quite out of context from our earlier decision. Ms. Riker has not been absolutely prevented from marrying a large portion of the eligible population of spouses. Now, most of us, you know, I mean, there are a lot of men out there in the world, and I'm actually interested in being married to only one of them. If somebody said, well, how about him, I probably would have said no. So that's not a good reason. In fact, the reason we talked about a small burden in Keeney is that as soon as the woman resigned from her employment, she was able to marry the prisoner in question. So the thought that there are a bunch of other men out there, and therefore your right to marry, is completely inconsistent with the Supreme Court's jurisprudence in this area, as well as common sense. And I'm certainly not going to sign my name to that. So I still don't see where's the problem with a single event in which she is allowed to come into the prison exclusively for the purpose of marriage? Why would the state object to that? So narrow, you know, so to get rid of most of what you talked about in your brief, but in that narrow sense. Sure, Your Honor. Well, first I'd like to point out, though, by accepting employment at the Wabash Valley Correctional Facility. You're not answering my question. She blew it. Six years ago, she misbehaved badly. Right, right. And we'll all agree with that. But now all she's asking is to be in the same room with this guy long enough to marry him. Right. I was just simply going to say, though, that by accepting employment there, she agreed. I think you ought to admit that the prisoner is still mad at her. Let her go. Right. I was getting to that. Right. She, you know, she limited her own right to have certain relationships, and she knew that as a- Where does the law support the fact that her violation of the prison physical contact rules, which she clearly violates, everybody gets that, forfeits her right to marry? Not, I mean, she's not asking for contact. She's not asking for lots of visits just to marry. Exactly, yeah. Well, you know, right, she knew she signed an agreement. She knew that she had an inappropriate relationship. I find this completely unpersuasive because it's not addressing the key point. Why does what I said, let's forget about the question whether she violated the rule. She violated the rule. Right. She quit her job. It was six years ago. Now the prison, out of spite, out of something, is saying, we will not make it possible for you to marry this man. Well, first, there's no case law requiring the department to forgive the gross transgression of the rules and the breach of trust. Are you sure that Turner does not? Turner looks at prison policies that stand in the way of the fundamental right to marry and actually strikes down the policy in that case. Right, that was a much more restrictive policy. Well, yours is 100% restriction for the rest of her life, so I don't know how it could be more restrictive. Well, that's not necessarily true. Mr. Vest is going to be released in 2030. Yeah, 2030, which would undermine Turner itself because Turner could have said the same thing and the Supreme Court did not. Aside from people with life without parole or the death penalty, everybody will, in fact, leave prison someday, and Turner did not go off on that idea. Isn't it fair to say that your superintendent's affidavit in this case is aimed at the general issue of visitation and not specifically at the issue of marriage? Is that correct? Yes, Your Honor. And now the case has been narrowed by the appellate to just marriage, right? Yes, they're related. Your client really hasn't had a chance to speak specifically to that, or arguably didn't. That's right, that's right. This issue wasn't present before the district court, the single visit issue. So that may have been an error on the part of the government at trial not to speak directly to that as part of its presentation. But the fact of the matter is you don't really have a specific presentation aimed specifically at marriage, at the celebration of marriage, which may not even be in the visitation room. Right. According to your own regulations. Right. If you're asking whether the department objects to their marriage in particular, that's not the issue. The department is concerned that if she were to return to the facility, given these circumstances, that she would present a security issue. But it was done in a visitation context. Per her requests, that was the way she had framed the case. If this marriage could take place in a chapel, it could take place in the warden's office, and I understand in many states that's where it's done, right? Would the same security concerns be present if it were done in the warden's office? Yes, because she would still be required to enter the prison, and there's just simply no way to ensure that someone who's very familiar with the screening protocols and who's proven that she's willing to break the rules. But that's just rote. She's walking into the prison with a guard by her side, heading for the warden's office, standing sufficiently apart from Mr. Vest that they can't speak to each other. She hasn't been there for six years, and the warden or the prison chaplain or somebody, perhaps a priest, quickly marries them, and then she's escorted back out again. I find it very difficult to see where these hypothetical security risks materialize. Well, Your Honor, if the court disagrees, then the case will have to go back. But the department wasn't required to anticipate each and every possible scenario. And again, there wasn't any specific information in this record regarding the security issue because it was a very different case below. It's the department's position that there's simply no way to ensure the safety of the staff and other offenders if she were required to enter. Right. So I just want to remind you that this all begins when Mr. Vest and Ms. Riker complete an application to marry one another, presumably from the prison, and they submit that application to the chaplain at the Wabash Valley Correctional Facility. So at the outset, it's absolutely clear that what they're looking for is marriage. It gets denied because WVCF says, well, we can't do that. They say, your fiancé would need to be on your approved visiting list in order for you to be able to be married. Ms. Riker is not on your list. So the idea that this has to do with their marriage is really not new to this case. That's true, Your Honor. Okay. Well, we will take all of this, of course, into consideration. Anything further, Mr. Rose? No, thank you, Your Honor. All right. In that case, we will take the case under advice.